UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEBRIE CROSS,

     Petitioner,            Civil No. 2:20-CV-10846
                                HONORABLE DENISE PAGE HOOD
v.                        UNITED STATES DISTRICT JUDGE

DEWAYNE BURTON,

     Respondent,

_____/

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING A CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS***

Jebrie Cross, ("Petitioner"), confined at the Handlon Correctional Facility in Ionia, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 through attorney Sanford A. Schulman. Petitioner challenges his conviction for two counts of first-degree felony murder, M.C.L.A. 750.316(1)(b) and one count of assault with intent to do great bodily harm less than murder, M.C.L.A. 750.84. For the reasons that follow, the petition for writ of habeas corpus is **DENIED WITH PREJUDICE.**

**I. BACKGROUND**

Petitioner was convicted following a jury trial in the Wayne County Circuit Court. His co-defendant Mariah Thomas was convicted before a separate jury but their cases were consolidated for appeal. This Court recites verbatim the relevant

1

facts regarding petitioner's conviction from the Michigan Court of Appeals' opinion affirming his conviction, since they are presumed correct on habeas review. *See Wagner v. Smith*, 581 F. 3d 410, 413 (6th Cir. 2009):

> Defendants' convictions arise from their involvement in the firebombing of a house that led to the deaths of Jana John (Jana) and James Jordan (James). A third occupant of the house, Jalen John (Jalen), suffered fire-related injuries, but survived. Jana and James had been dating for a short period before the fire. James was Thomas's former boyfriend and the father of Thomas's child. On December 13, 2015, Thomas and codefendant Daquana Williams were driving by Jana's home and saw both James and Jana on the porch outside the house. Thomas stopped her vehicle, following which both she and Williams became involved in a verbal and physical confrontation with Jana, James, and Jana's sister. Williams sustained facial injuries from being assaulted by Jana and her sister. According to witnesses, Thomas and Williams left the house after the police were called, but Thomas threatened to return later and "shoot the place up."

> The prosecution's theory of the case was that after Thomas and Williams left, they recruited others, including defendant Cross, to join them in returning to Jana's home to retaliate for the earlier assault. Before returning to Jana's house, Thomas, who was driving the group in her vehicle, stopped at a gas station. Defendant Cross then filled at least one, and up to three, bottles with gasoline. The group parked a few blocks away from Jana's house and approached on foot. One or more lighted glass bottles containing gasoline were thrown at the house, causing an intense, rapidly spreading house fire. Jana and James, who were asleep in an upstairs bedroom, died of smoke inhalation and burns. Jana's brother, who was asleep in the living room, suffered injuries from the fire but survived. Fearing retaliation from the fight, other family members who resided at the house had left earlier and spent the night at a hotel.

> A codefendant, Tre'era Davis, who was present when the firebombing occurred, pleaded guilty to second-degree murder and testified at trial.

Davis testified that Cross made statements in the car as they drove to the victims' house about firebombing in particular that he planned to throw a bottle of gasoline at the house to get the victims to run out. Davis testified that she saw only Cross throw a bottle at the house. Afterward, however, when they were discussing the incident, Davis heard Thomas say that both she and Cross had thrown bottles at the house.

Thomas testified at her trial and admitted being involved in the earlier fight, but denied that she wanted to return to the house to continue the confrontation. She also denied that she ever intended to firebomb the house and denied knowing that Cross had filled any bottles with gasoline. Thomas testified that it was Cross who wanted to return to the house after he saw the injuries to Williams, and she claimed that she was forced to go along with the others. The jury also heard Thomas's statement to the police, in which she stated that they bought the gasoline because Cross was going to "cocktail" the victims' house, but this was supposed to occur after the group fought the women who assaulted Thomas and Williams earlier. Thomas testified at trial that she did not know about the plan to firebomb the house and only learned afterward that Cross had thrown a lighted bottle with gasoline at the house.

At Cross's trial, the jury heard his statement to the police, in which he described Thomas's plan to firebomb the victims' house. Cross stated that he did not see who threw the bottles at the home, and he denied that he threw any bottles himself.

*People v. Thomas*, No. 335071, 2018 WL 5304897, at * 1–2 (Mich. Ct. App. Oct. 25, 2018); *lv. den.* 503 Mich. 1002, 924 N.W.2d 560 (2019).

Petitioner seeks a writ of habeas corpus on the following ground:

Trial counsel failed to provide constitutionally effective assistance of counsel where he failed to properly pursue Defendant's assertion that he was not competent to stand trial or to waive his *Miranda* rights and that he gave a false confession. Defense counsel requested that the

3

confession be suppressed too late and counsel did not request an adjournment, and Defendant's forensic examination did not take place until after trial began, and a *Ginther* [evidentiary] hearing is necessary.

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply

4

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

## III. DISCUSSION

Petitioner argues that he was denied the effective assistance of trial counsel because his attorney failed to timely obtain an independent psychiatric evaluation to seek the suppression of petitioner's statement to the police by establishing that he was not mentally competent to waive his *Miranda* rights.

A defendant must satisfy two things to establish the denial of the effective assistance of counsel. First, the defendant must demonstrate that his or her attorney's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. Stated differently, the defendant must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id*. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the

6

proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101.

Because of this doubly deferential standard, the Supreme Court has indicated that:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 562 U.S. at 105.

In addition, a reviewing court must not merely give defense counsel the benefit of the doubt but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did. *Cullen v. Pinholster,* 563 U.S. 170, 196 (2011).

The Michigan Court of Appeals summarized the factual background of petitioner's claim:

> In January 2016, defense counsel requested evaluations regarding Cross's criminal responsibility, competency to stand trial, and competency to waive his *Miranda* rights. In March 2016, the trial court issued orders for Cross to be evaluated for criminal responsibility and competency to stand trial, but delayed ordering that he be evaluated for competency to waive his *Miranda* rights until May 2016. In June 2016, Cross was found competent to stand trial, and in July 2016, Cross was found not mentally ill. While the parties were still waiting for completion of the evaluation of Cross's competency to waive his *Miranda* rights, the court advised defense counsel that there would not be much time to procure an independent evaluation of Cross should counsel wish to challenge the findings made by the Center for Forensic Psychiatry (CFP).

> The CFP ultimately found Cross competent to waive his rights. During an evidentiary hearing to determine the admissibility of Cross's police interview, trial counsel advised the court that Cross's family had hired an independent psychologist to investigate whether Cross was

8

competent to waive his rights. The court continued with the suppression hearing and, after reviewing the testimony, the video recording of Cross's interview, and the CFP report that Cross was competent to waive his rights, the trial court concluded that his statement was intelligently and voluntarily made.

Cross's trial began on August 30, 2016. Mid-trial, defense counsel advised the court that he had just received an independent forensic evaluation of Cross. The report had been prepared by Leslie Kaye, Ph.D., at the request of another attorney and without trial counsel's knowledge or involvement. In her evaluation, Kaye opined that Cross operated overall at a first-grade level, and she concluded that he was not competent to waive his *Miranda* rights. Defense counsel asked the court to either conduct a competency hearing and consider the independent evaluation, or allow the defense to add Kaye as a trial witness. The trial court denied counsel's requests, holding that Cross or his family were tardy in procuring the evaluation, the prosecutor was not provided with sufficient notice, and Kaye's qualifications as an expert witness were not established. The court specifically faulted Cross or his family, not trial counsel, for failing to timely offer Kaye as a witness. However, although the court refused to permit Kaye to testify, the court allowed Cross to submit Kaye's evaluation and her curriculum vitae for the record.

After he was convicted, Cross filed a motion for a new trial and requested an evidentiary hearing on his claim that defense counsel was ineffective for not properly pursuing the issue of Cross's competency to waive his constitutional rights. The trial court denied the motion, stating:

Okay. Well, um, it appears to me that the delay in obtaining the independent report was not Mr. Blake's [trial counsel's] shortcoming. I think the record is clear. And I'm sort of remembering all of this as we're talking about it, too.

It wasn't, to put it in layman's terms, it just wasn't Mr. Blake's fault. His family created, the defendant's family that is, a lot of confusing

signals about a number of things in terms of the defense of Mr. Cross in this case. And one of them was their very delayed obtaining of an independent report.

Now, you can say that's because Mr. Blake didn't adequately communicate that to them. But the, the explanation that Mr. Blake gave on the record, of course he wasn't subject to cross-examination at the time, put the entire delay on the family.

Then, then there is, as counsel for the People point out the, the really overwhelming evidence against Mr. Cross even without his confession. And although I'm not frankly in a position to say unabashedly that I would have still maintained my decision against suppressing the confession even if I had the expert's report in front of me, which I didn't and still don't, I, I was, while you were talking, glancing at the forensic report and noticing that the forensic examiner was of the opinion in some respects that Mr. Cross was exaggerating his symptoms. And that report fully supports this court's decision to deny the motion to suppress.

And I, I don't see what can be gained from examining Mr. Blake or Mr. Simon [the attorney who commissioned Kaye's report] for that matter or any one else involved in this case. I will deny the motion for a new trial based on ineffective assistance of counsel. I, I think the trial record supports Mr. Blake's competency.

If the Court of Appeals feels otherwise, I guess they can send him back, but right now I'm disinclined to order a *Ginther* hearing.

The record shows that trial counsel timely moved to have Cross evaluated for his competency to stand trial and to waive his *Miranda* rights. It was not until July 15, 2016, that defense counsel was aware that Cross had been determined to be competent to stand trial. Based on that assessment, and the likelihood that Cross would also be found competent to waive his *Miranda* rights, the trial court suggested to

defense counsel that if he wanted an independent evaluation, he should obtain one soon because the trial date was approaching.

The existing record shows that for unknown reasons, Cross's family retained Kaye through another attorney without involving trial counsel. Kaye's evaluation states that she met with "defense counsel" on August 27, 2016, and attempted to first interview Cross on August 28, 2016. Cross's trial began on August 30, 2016. Kaye apparently was not allowed to enter the jail to evaluate Cross until September 2, 2016. It was not until September 6, 2016, that Cross's trial counsel requested that the trial court consider Kaye's evaluation regarding Cross's competency. Cross's trial concluded on September 7, 2016.

*People v. Thomas*, 2018 WL 5304897, at * 7–8.

The Michigan Court of Appeals then rejected petitioner's allegation that trial counsel had been ineffective in his handling of the issue of petitioner's competency to waive his *Miranda* rights:

The record supports the statements made by trial counsel that Cross's family had procured the services of a second attorney who hired Kaye to evaluate Cross. There is no evidence contradicting trial counsel's statements to the court that he was unaware that the family had taken these steps until he was presented with a copy of Kaye's evaluation. Likewise, there is no evidence, such as an affidavit from Cross's family members or trial counsel, to support any claim that there was a plan to have the family fund an independent evaluation as part of Cross's defense strategy, other than a brief comment at the hearing on August 24, 2016, that the family had hired someone to possibly conduct an independent evaluation. Rather, the record indicates that the family decided to retain the services of a psychologist to perform an independent evaluation through another attorney who was not working with trial counsel. There is no evidence or an offer of proof that Cross mentioned the independent evaluation to defense counsel at any point before the results of the evaluation were provided to counsel during trial.

11

Because the record shows that trial counsel was unaware that Cross's family had actually obtained an independent evaluation to challenge his competency, we cannot conclude that trial counsel was ineffective for not timely offering Kaye's independent evaluation to the court.

In any event, Cross has not demonstrated a reasonable probability that the outcome of the case was affected by counsel's failure to obtain an independent evaluation. The video recording of Cross's interview shows that the officers who interviewed him took appropriate steps to make sure that he understood his constitutional rights after he told them that he suffered from a learning disability. Although Cross may have had difficulty reading and writing, the officers read his rights to him and confirmed that he understood each right. Cross sought explanations of his right to remain silent and whether the cost of an attorney would be paid by the state. After additional explanation, Cross confirmed that he understood these rights and wanted to talk to the police. Nothing in the interview supports a conclusion that Cross lacked the ability to comprehend the rights he was waiving by agreeing to talk to the police. In fact, as the trial court observed, Cross appeared eager to give the police his account, which largely minimized Cross's role in the offense and shifted the blame to others.

Furthermore, the CFP evaluation of Cross's competency to waive his rights found that Cross possessed the intellectual capacity to make a valid waiver and that he attempted to misrepresent his academic abilities and his psychiatric symptoms. Given the evaluations by the CFP regarding Cross's competency, in addition to the contents of the actual interview, Kaye's evaluation was not reasonably likely to change the trial court's rulings regarding Cross's motion to suppress and his competency to stand trial. While Kaye concluded that Cross was intimidated by authority figures and lacked the intelligence to comprehend waiving his right to counsel or to remain silent, the video recording does not show that the officers used intimidation tactics to coerce his statement, and it shows that the officers endeavored to answer Cross's questions and explain his rights to him. The record shows that trial counsel considered seeking an independent evaluation, but was unlikely to obtain funding for an independent evaluation at state expense because he had been retained, see *People v. Ericksen*, 288

12

Mich. App. 192, 201; 793 N.W.2d 120 (2010)(counsel is not ineffective for failing to advance a meritless position), and that counsel was not timely informed of the family's involvement in obtaining an independent evaluation.

In sum, although Cross claims that it was objectively unreasonable for counsel to proceed to trial before Kaye's evaluation of Cross had been completed or presented to the court, the record shows that Cross and his family did not apprise counsel of their efforts to hire Kaye. Under the circumstances, trial counsel cannot be faulted for not seeking an adjournment to procure or present the evaluation in a timelier manner. Further, even if trial counsel should have done more to procure an independent evaluation, Cross has not shown a reasonable probability that the outcome was affected by the failure to procure an independent evaluation of Cross's competency to waive his constitutional rights or to stand trial.

*People v. Thomas*, 2018 WL 5304897, at * 9.

The Michigan Court of Appeals' decision was reasonable, precluding habeas relief.

First, there is no indication from the record that petitioner's trial counsel was aware prior to trial that Dr. Kaye had issued a report finding that petitioner was not mentally competent to waive his *Miranda* rights.  A trial attorney is not ineffective for failing to call witnesses whom he or she is unaware of. *See Ballinger v. Prelesnik*, 709 F.3d 558, 563 (6th Cir. 2013); *See also Bigelow v. Williams*, 367 F.3d 562, 571 (6th Cir. 2004) "Counsel cannot be expected to interview unknown witnesses." *Ballinger,* 709 F. 3d at 563.  In the absence of any evidence that trial counsel was informed about Dr. Kaye's findings or report by petitioner or his family prior to trial,

13

the state court's rejection of this portion of petitioner's ineffective assistance of counsel claim was not unreasonable. *Id.*

Secondly, once petitioner's trial counsel was informed of Dr. Kaye's report and her findings, he did ask the trial court to conduct a second competency hearing and consider Dr. Kaye's report and testimony, or in the alternative, allow Dr. Kaye to testify at trial, but the judge rejected counsel's request.  The Supreme Court has observed that "[a]n objection which is ample and timely to bring the alleged federal error to the attention of the trial court and enable it to take appropriate corrective action is sufficient to serve legitimate state interests, and therefore sufficient to preserve the claim for review." *Douglas v. State of Ala.*, 380 U.S. 415, 422 (1965). Indeed, "[N]o legitimate state interest" is served "by requiring repetition of a patently futile objection," which has been rejected several times, "in a situation in which repeated objection might well affront the court or prejudice the jury beyond repair." *Id.*  Counsel did attempt to get the judge to conduct a competency hearing and consider Dr. Kaye's findings that petitioner was incompetent to waive his *Miranda* rights, but his request was denied.

Thirdly, petitioner failed to show that his statement to the police would have been suppressed even if Dr. Kaye had been presented as a witness at the initial suppression hearing, because the state courts reasonably concluded that petitioner's mental condition did not invalidate petitioner's waiver of his *Miranda* rights.

14

In considering federal habeas petitions, a federal district court must presume the correctness of state court factual determinations, and a habeas petitioner may rebut this presumption only with clear and convincing evidence. *Bailey v. Mitchell*, 271 F. 3d 652, 656 (6th Cir. 2001); 28 U.S.C. § 2254(e)(1).  Whether a defendant understood his or her *Miranda* rights is a question of fact underlying the question of whether his waiver of those rights was knowing and intelligent.  On federal habeas review, a federal court has to presume that the state court's factual finding that a defendant fully understood what was being said and asked of him was correct unless the petitioner shows otherwise by clear and convincing evidence. *Williams v. Jones,* 117 F. App'x. 406, 412 (6th Cir. 2004); *See also Terry v. Bock,* 208 F. Supp. 2d 780, 789 (E.D. Mich. 2002).

A defendant's waiver of his *Miranda* rights is considered valid if it is voluntary, knowing, and intelligent. *Miranda v. Arizona*, 384 U.S. 436, 444, 475 (1966).  Coercive police activity is a necessary predicate to finding that a defendant's waiver of his *Miranda* rights was involuntary. *Colorado v. Connelly,* 479 U.S. 157, 167, 169-70 (1986).   A defendant's deficient mental condition, by itself, is insufficient to render a waiver involuntary. *Id.* at 164-65.  "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Connelly*, 479 U.S. at 165.

The only evidence that petitioner has to support his claim that he was not mentally competent to waive his *Miranda* rights is Dr. Kaye's findings that petitioner operated at a first-grade level and that this low level of intelligence prevented him from understanding his rights or having the mental competency to determine whether or not to waive them.   A defendant's low intelligence or diminished capacity, by itself, does not by itself prevent a defendant from validly waiving his or her *Miranda* rights. *See Garner v. Mitchell*, 557 F.3d 257, 264-65 (6th Cir. 2009).   Instead, "that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to, the interrogation." *Id.* at 265.   There have been "several instances where defendants, despite their mental retardation or low I.Q.'s, were found to have waived their rights knowingly and intelligently." *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005).

In the present case, petitioner failed to show that his intelligence level prevented him from validly waiving his *Miranda* rights or that the state courts' rejection of his claim was unreasonable.   The videotape from the interrogation showed that the police carefully explained petitioner's *Miranda* rights to him. Petitioner asked several questions about his rights, which were answered by the police.   Petitioner was cooperative and after being given additional explanations about his rights, indicated that he was willing to speak with the police.   Petitioner gave a statement to the police which actually sought to minimize his role in the

crime.  Although petitioner allegedly functioned at a first-grade level, he was not so mentally retarded that the police would have a reason to believe that petitioner could not understand his rights.  All of these factors support a finding that petitioner validly waived his *Miranda* rights in spite of his low intelligence level. *Garner,* 557 F. 3d at 265-66.

In addition, there is no evidence that the police engaged in coercive or intimidating behavior towards petitioner.  The Sixth Circuit has noted that "police overreaching is necessary for a confession to be found invalid under the Due Process Clause of the Fourteenth Amendment." *Clark v. Mitchell*, 425 F.3d at 283 (citing *Connelly,* 479 U.S. at 164).  In the absence of any police overreaching in this case, petitioner would have been unable to get his statement suppressed.  Petitioner was not prejudiced by counsel's failure to present additional evidence of petitioner's mental condition at the suppression hearing or trial. *Id.* at 283.  More importantly, the totality of the circumstances establish that petitioner validly waived his *Miranda* rights in spite of his low level of intelligence.  Accordingly, trial counsel was not ineffective for failing to introduce additional evidence of petitioner's mental condition at the suppression hearing or at trial because there is no reasonable likelihood that petitioner's statement would have been suppressed. *Id.* at 283-84.

Finally, as the state trial judge noted when rejecting petitioner's claim, the evidence of petitioner's guilt was overwhelming even in the absence of petitioner's

confession.   Petitioner and his three co-defendants, Davis, Thomas and Williams

planned the firebombing together the evening of December 13-14, 2015, after Jana

John beat up Williams during a fight earlier that evening. (ECF No. 8-12, Page ID.

709-11).   Text messages which showed communication between petitioner and

Thomas were admitted at trial. (*Id.*, PageID. 829-33).   Petitioner's co-defendant

Davis testified about petitioner's involvement in the crime by preparing the Molotov

cocktails for the fire-bombing.   Davis testified that the co-defendants stopped at a

gas station to purchase gasoline.   Davis said that petitioner found several bottles

there and filled them with gasoline. (*Id.,* PageID. 711-12).   Surveillance video from

the gas station showed petitioner filling bottles with gasoline. (ECF No. 8-13,

PageID. 880).   Davis testified that as they were driving to the John house, petitioner

asked Thomas "if she wanted to just set the house on fire.  And he said that he could

throw the bottle in the house and they can run out and we can fight." (ECF No. 8-

12, Page ID. 714).   Davis testified she observed petitioner hold the bottle in his hand

and throw it at the house. (*Id.,* PageID. at 723, 755, 762).

The prosecution also admitted evidence of petitioner's consciousness of guilt.

"It is today universally conceded that the fact of an accused's flight, escape from

custody, resistance to arrest, concealment, assumption of a false name, and related

conduct, are admissible as evidence of consciousness of guilt, and thus of guilt

itself." *United States v. Serio*, 440 F.2d 827, 831–32 (6th Cir. 1971)(quoting 2

Wigmore on Evidence, Third Edition, § 276). Detroit Police Officer Bryan Bush testified that after the police had identified petitioner as a suspect and had gone to his mother's house to arrest him, upon seeing the police petitioner fled on foot. (ECF No. 8-12, PageID. 781-82). Davis testified that petitioner and the other defendants fled the scene immediately after the bottles were thrown through the window of the Johns' house. (*Id.,* PageID. at 715).

Given the overwhelming evidence of guilt in this case, the trial court reasonably determined that petitioner was not prejudiced by counsel's failure to present additional evidence of petitioner's mental condition at the suppression hearing or at trial. *See Crawley v. Curtis*, 151 F. Supp. 2d 878, 885 (E.D. Mich. 2001)(State court determination that counsel was not ineffective in failing to move to suppress statement that was taken in violation of *Miranda* was a reasonable application of *Strickland*, such that petitioner was not entitled to habeas relief, where there was evidence from which state court could reasonably find that petitioner was not prejudiced, given overwhelming evidence of his guilt apart from his statement). Petitioner is not entitled to habeas relief on his claim.

## IV. Conclusion

The Court denies the petition for writ of habeas corpus.

In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).

To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.*

In order to obtain a certificate of appealability, a habeas petitioner need not show that his or her appeal will succeed. *Miller-El v. Cockrell,* 537 U.S. 322, 337 (2003). The Supreme Court's holding in *Slack v. McDaniel* "would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief." *Id.* A habeas petitioner is not required to prove, before obtaining a COA, that some jurists would grant the petition for habeas corpus. *Id.* at 338. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail". *Id.*

Although this Court believes its decision was correct, the Court will nonetheless grant a certificate of appealability to petitioner in light of Dr. Kaye's

report and her belief that petitioner was not competent to waive his *Miranda* rights. In addition, any doubt regarding whether to grant a COA from the denial of a petition for federal habeas relief is resolved in favor of the habeas petitioner, and the severity of the penalty may be considered in making that determination. *See Newton v. Dretke,* 371 F. 3d 250, 253 (5th Cir. 2004).  Any doubts regarding the issuance of a COA in this case should be resolved in petitioner's favor, in light of the nonparolable life sentence that he is serving.  Because this Court is granting a certificate of appealability, petitioner's appeal would be undertaken in good faith; petitioner is granted leave to appeal *in forma pauperis*. *See Brown v. United States,* 187 F. Supp. 2d 887, 893 (E.D. Mich. 2002).

## V.  ORDER

Based upon the foregoing, IT IS ORDERED that:

(1) the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

(2) A certificate of appealability is **GRANTED.**

(3) Petitioner is **GRANTED** leave to appeal *in forma pauperis.*

s/Denise Page Hood
HON. DENISE PAGE HOOD
Dated:  March 31, 2022          UNITED STATES DISTRICT JUDGE